IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Consumer Financial Protection Bureau,

       Plaintiff,

       v.

Climb Credit, Inc., Climb Investco, LLC,
Climb GS Loan Fund 2018-1, LLC, 1/0
Holdco LLC, and 1/0 Capital LLC.

       Defendants.

Case No. 1:24-cv-07868

## COMPLAINT

The Consumer Financial Protection Bureau (Bureau) brings this action against Climb Credit, Inc. (Climb Credit), Climb Investco, LLC (Investco), Climb GS Loan Fund 2018-1, LLC (CGS), 1/0 Holdco, LLC (1/0 Holdco), and 1/0 Capital, LLC (1/0 Capital) (collectively, Defendants) for (1) committing deceptive and abusive acts and practices in violation of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1) in their marketing of private student loans they offered to consumers; and (2) violating the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq., and Regulation Z, 12 C.F.R. Part 1026, in their marketing of private student loans they offered to consumers and disclosures to consumers who took out such loans. The Bureau alleges as follows:

## INTRODUCTION

1.     Climb Credit, an online lender that was incubated and founded in 2014 by investment companies 1/0 Holdco and 1/0 Capital, markets private student loans to consumers (Climb Loans) that are originated by Climb Credit's wholly owned subsidiary, Investco. Climb

Loans are mainly used to fund tuition for short-term vocational programs at schools with whom Climb Credit has partnered (Partner Schools).

2.      Through numerous statements displayed on its website and in marketing materials disseminated to consumers since at least 2017, Defendants assured consumers that if a Climb Loan was available to fund tuition for an educational program offered by a Partner School, the consumer could trust that Climb Credit had vetted the quality of that program for "outcomes and value" by determining that the program had passed Climb Credit's proprietary return-on-investment analysis. Through these representations about Climb Credit's vetting process, Defendants positioned Climb Credit as a trusted intermediary by presenting it as a company that prospective borrowers could rely upon to act in their interests by identifying quality educational programs.

3.      Contrary to these assurances, Defendants offered Climb Loans for many programs that they had not vetted for quality. Defendants often used baseless, inaccurate, or otherwise unreliable inputs and assumptions in their calculations of the purported return-on-investment analysis for many programs, such that their determination that the program passed the return-on-investment analysis was a sham. Defendants also offered Climb Loans for programs that they determined had failed their return-on-investment analysis or for which they had not even conducted any return-on-investment analysis. By representing that Climb Credit had vetted programs for quality when they had not done so, Defendants violated the CFPA's prohibition against deceptive acts and practices.

4.      In response to Defendants' marketing of Climb Credit as a trusted intermediary, consumers reasonably relied on Climb Credit to act in consumers' interests when identifying quality educational programs that consumers could finance using a Climb Loan. Defendants'

supposed vetting of these programs was intended to differentiate it from competitors, and drive enrollment at its Partner Schools, and, in turn, the volume of Climb Loans originated. Defendants thereby maximized their revenues by inducing consumers to take out loans without regard to the actual quality of the programs offered by their Partner Schools. In doing so, Defendants took unreasonable advantage of consumers' reasonable reliance, in violation of the CFPA's prohibition against abusive acts and practices.

5.    The default rate for Climb Loans regularly exceeded 20%. For many Partner Schools, the default rate for Climb Loans used to finance borrowers' enrollments at those schools exceeded 40%. Defendants, however, reaped greater profits by maximizing the number of consumers who took out a Climb Loan, regardless of the quality of the program or the likelihood of default.

6.    As part of their efforts to induce borrowers to take out Climb Loans, Defendants' website and marketing materials also included various representations about specific outcomes that had been achieved by graduates of educational programs at its Partner Schools, including purported statistics about the average median salary increase for graduates of Partner Schools, full-time employment rates for graduates of Partner Schools, and average salaries for graduates of certain programs. Although the outcome statistics that Defendants advertised made it more likely that a consumer would take out a Climb Loan to enroll in a Partner School program, they were false and very likely inflated.

7.    Defendants also violated Regulation Z by: (a) disclosing inaccurate finance charges to Climb Loan consumers; (b) disseminating advertisements for Climb Loans which stated a simple interest rate or triggering terms without disclosing the applicable Annual Percentage Rate (APR); and (c) using the name, emblem, or logo of certain educational

institutions in Climb Loan advertisements in a manner that implied that those institutions endorsed the Climb Loan without providing the required disclosure in a manner that was both equally prominent and closely proximate to the reference to the educational institution.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this action because it concerns federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

9.      This Court has personal jurisdiction over the Defendants and venue is proper in this district because each Defendant resides and/or does business in this district. 12 U.S.C. § 5564(f).

## PARTIES

10.      The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority and is charged with enforcing Federal consumer financial laws, including the CFPA. 12 U.S.C. §§ 5531(a), 5564(a)-(b), 5481(14).

11.      Climb Credit is a Delaware corporation headquartered in Las Vegas, Nevada that markets private student loans in the United States. Until 2022, Climb Credit was headquartered in New York, New York, and it continues to conduct a significant amount of its operations there.

12.      Investco is a Delaware limited liability company that is a wholly owned subsidiary of Climb Credit. Investco originates private student loans marketed by Climb Credit and is licensed or otherwise able to originate loans nationwide. Its business expanded from more than $8 million in Climb Loan originations in 2015 to more than $218 million in 2022.

13.    CGS is a Delaware limited liability company and a wholly owned subsidiary of Investco. CGS is a special purpose vehicle that acts as borrower under a loan facility that Investco uses to finance certain of its private student loans.

14.    1/0 Holdco is a Delaware limited liability company with its principal place of business in New York. 1/0 Holdco is an investment holding company and Climb Credit's largest shareholder. 1/0 Holdco owned a majority stake in Climb Credit from Climb Credit's founding until 2015.

15.    1/0 Capital is a Delaware limited liability company with its principal place of business in New York.

16.    1/0 Capital and 1/0 Holdco (collectively, 1/0) are affiliated with each other through common ownership.

17.    At all times material to this Complaint, Climb Credit and Investco have been "covered persons" under the CFPA because they have extended credit offered or provided for use by consumers primarily for personal, family, or household purposes. 12 U.S.C. § 5481(5), (6)(A), (15)(A)(i).

18.    At all times material to this Complaint, CGS has been a "related person" under the CFPA, and thus a "covered person" under the CFPA, because it has materially participated in the conduct of Climb Credit and Investco's affairs by funding private education loans offered and provided by Climb Credit and Investco. 12 U.S.C. § 5481(25).

19.    At all times material to this Complaint, 1/0 Capital has been a "related person" under the CFPA, and thus a "covered person" under the CFPA, because it has materially participated in the conduct of the affairs of Climb Credit through, among other things, the acts described in Paragraphs 22-39 of this Complaint. 12 U.S.C. § 5481(25). 1/0 Capital has also been

a "covered person" under the CFPA by virtue of its affiliation with and provision of material services to Climb Credit. 12 U.S.C. §§ 5481(6)(B), (26).

20.     At all times material to this Complaint, 1/0 Holdco was a "related person" under the CFPA, and thus a "covered person" under the CFPA, because it is a shareholder of Climb Credit that materially participated in the conduct of Climb Credit's affairs, including through its affiliate 1/0 Capital. 12 U.S.C. § 5481(25).

21.     Since at least 2015, Respondents have operated as a common enterprise. Accordingly, Respondents are jointly and severally liable for the acts and practices of all the Defendants.

## FACTUAL BACKGROUND

### The Climb Enterprise

22.     At all times material to this Complaint, the Defendants have operated as a common enterprise (the Climb Enterprise), including with regard to the allegations contained in Paragraphs 40-116 of this Complaint.

23.     Climb Credit and 1/0 have shared numerous officers and other personnel.

24.     1/0 Capital is a services company that employs people who provide services at cost (i.e., with no mark-up) to other companies held by 1/0 Holdco.

25.     In April 2015, Climb Credit and 1/0 Capital entered into an Employee Allocation Agreement, which formalized the mechanism through which 1/0 Capital would provide human capital to Climb Credit at cost.

26.     The Employee Allocation Agreement was signed on 1/0 Capital's behalf by 1/0 member Nicholas Calamari, and on Climb Credit's behalf by its CEO Alexander Rafael. At the time that the agreement was executed, Mr. Calamari was also serving as Climb Credit's general counsel, and Mr. Rafael was also a member at 1/0 Holdco.

27.     At Climb Credit's founding, all Climb Credit personnel were also either employed

by or members of 1/0, including:

- Alexander Rafael, Chief Executive Officer of Climb Credit.
- Vishal Garg, Chairperson of Climb Credit.
- Amit Sinha, Chief Financial Officer of Climb Credit.
- Ziggy Jonsson, Chief Technology Officer of Climb Credit.
- Nicholas J. Calamari, General Counsel of Climb Credit.
- Raza Munir, SVP of Partner Success of Climb Credit.

28.     Mr. Munir, who served as Climb Credit's SVP of Partner Success, and later as

Climb Credit's Director of Business Development, was employed by 1/0 Capital until 2020. He

did not formally become a Climb Credit employee until 2020.

29.     In addition to occupying Climb Credit's highest-level positions, 1/0 personnel

staffed many segments of Climb Credit's business operations, including marketing, operations,

legal, recruiting, human resources, capital markets, and engineering.

30.     These shared personnel between Climb Credit and 1/0 helped to establish Climb

Credit's program of private student loans and its marketing of those loans to consumers.

31.     Mr. Calamari—who from 2014 through 2020 was employed by 1/0 Capital, and

continues to be a member of 1/0 Holdco—was responsible for Climb Credit's compliance with

consumer financial protection laws, signed contracts with Partner Schools on Climb Credit's

behalf, and regularly provided legal advice to Climb Credit on marketing matters.

32.     1/0 Capital personnel developed and helped implement advertising strategies and

practices for Climb Credit.

33.     Climb Credit's first consumer-facing technological platform was built by a team

of 1/0 personnel.

34.     Both Investco and CGS shared personnel with Climb Credit as well: former

Climb Credit CEO Angela Prince was an officer at all three entities. Along with Prince, current

Climb Credit CEO Casey Powers and COO Alecia Chen were also officers at Investco. Actions taken by either Investco or CGS were executed by Climb Credit personnel, and agreements to which either entity was a party were signed on their behalf of a Climb Credit representative.

35.     By installing 1/0 personnel in so many of Climb Credit's highest-level positions, 1/0 controlled Climb Credit.

36.     1/0 Holdco has been Climb Credit's largest shareholder since Climb Credit's inception, and it continues to own more than a third of Climb Credit's equity today.

37.     Until 2019, 1/0 Holdco and two of its constituent members have collectively owned more than 68% of Climb Credit's stock.

38.     Investco has always been a wholly owned subsidiary of Climb Credit, and CGS has always been a wholly owned subsidiary of Investco.

39.     Climb Credit, Investco, and CGS have always shared the same physical address, and until at least 2016, 1/0, Climb Credit, and Investco shared physical offices.

### The Climb Enterprise Positioned Climb Credit as a Trusted Intermediary for Consumers and Made False Representations About Its Vetting of Partner Schools

40.     The Climb Enterprise disseminated advertisements about Climb Loans that contained representations about the vetting process it claimed to undertake before partnering with a school and funding loans for attendance at specific educational programs at that school (Vetting Process Representations).

41.     On its website, on marketing materials disseminated on its own through social media or other channels, and on marketing materials provided to Partner Schools for their dissemination to current and prospective students, the Climb Enterprise sometimes referred to this vetting process as its return-on-investment analysis.

42.    The Climb Enterprise has described its return-on-investment (ROI) analysis using the following representations in its marketing materials to prospective borrowers:

- "Our proprietary ROI calculation incorporates school, student, and alumni data [such as] tuition, graduation rate, job placement, borrowing costs, current income, [and] post-grad income."

- "We strive to work only with programs that benefit students, so we will only fund a course if it passes our ROI calculation. Not every program will pass the test, and we've turned away business because of this."

- "By creating measurements to gauge what students can expect to receive from their educational investment, we can hold schools accountable for the education they're selling and ensure that we're helping students reach their goals in a financially responsible way."

- "How important is this calculation in determining our partnerships? In a word: very."

- "We verify all our schools and programs for outcomes and value."

- "Every school in our network meets our career-advancing criteria."

- "We created our verification models to ensure that, whether it be through career-advancing programs or career exploration programs, everyone involved in the financing process benefits from it – especially the students."

- "We look at the net cost of the program … and compare that to the expected salary growth – all while factoring in the likelihood of graduation and job placement."

- "We only partner with schools that have been vetted for quality and deliver results for students."

43.    The Climb Enterprise also permitted Partner Schools to use verification badges, like the example shown in Figure 1 below, to represent that the Partner School or program has passed the Climb Enterprise's return-on-investment analysis:



**Figure 1**

44.    Until November 2021, the Climb Enterprise's website also contained a "Compare Programs" tool, which enabled consumers to search for and compare educational programs that they could fund through Climb Loans. That "Compare Programs" tool identified some programs as "Climb verified" and "Verified by Climb for high ROI."

45.    Through these Vetting Process Representations, the Climb Enterprise assured consumers considering Climb Loans that it had vetted Partner Schools' programs for outcomes and value and identified quality educational programs for consumers by using reliable, program-specific data to calculate a return-on-investment that was specific to the program being advertised and determined that the return-on-investment for the program passed the Climb Enterprise's return-on-investment calculation.

46.    The Climb Enterprise has marketed its ability to identify quality educational programs as its central value proposition to consumers considering Climb Loans. On its website,

in social media advertisements and posts, in "thought leadership" pieces, and on hard-copy marketing materials like flyers and trifolds, the Climb Enterprise touted the centrality of its program-specific return-on-investment analysis to its business model, emphasizing that it only funds loans with programs that have passed its return-on-investment analysis. In doing so, the Climb Enterprise presented Climb Credit to prospective borrowers as a trusted intermediary between consumers and Partner Schools.

47.    Reliance on the Climb Credit's role as a trusted intermediary was the exact reaction the Climb Enterprise sought to elicit from consumers.

48.    The Climb Enterprise's Vetting Process Representations made it more likely that consumers would respond to its marketing and advertisements and potentially enter into a Climb Loan to attend a Partner School program.

49.    The Climb Enterprise understood Climb Credit's role as a trusted intermediary to be a differentiator between it and its competition: other private student loan providers.

50.    The Climb Enterprise has derived its revenues from origination and master servicing fees charged on each loan, as well as interest on those loans it holds (i.e., those loans that it does not securitize and sell to investors after origination).

51.    The Climb Enterprise profited from positioning itself as a trusted intermediary in the market because that purported role differentiated it from its competitors; drove enrollment at Partner Schools; and, in turn, increased its loan volume.

52.    The Climb Enterprise generated millions of dollars in origination fees and interest from consumers who took out Climb Loans believing they would obtain what the Climb Enterprise assured them would be a career-advancing education.

53.    The Climb Enterprise has also derived reputational benefits from Climb Credit's purportedly consumer-allied role as a trusted intermediary.

54.    The Climb Enterprise derived profits and reputational benefits by cultivating consumers' reasonable reliance based on Climb Credit's purported role as a trusted intermediary.

55.    The Vetting Process Representations were frequently false or otherwise misleading for at least the following reasons:

     a.  The Climb Enterprise funded programs that failed its return-on-investment analysis or for which it had not yet conducted a return-on-investment analysis before making the Vetting Process Representations.

     b.  The Climb Enterprise used generalized outcomes data applicable to an entire vocation rather than program-specific data to calculate the return-on-investment for the program purportedly being evaluated.

     c.  The Climb Enterprise imported outcomes data applicable to one program at a Partner School into the return-on-investment analysis for a different program at that school, even if the two programs were materially dissimilar (e.g., a master's program versus a certification program).

     d.  The Climb Enterprise used other unsupported assumptions to justify data inputs into its return-on-investment analysis, such as assuming high graduation and job placement rates for brand-new programs without any supporting data.

     e.  The Climb Enterprise relied on information received from Partner Schools that it could not independently verify or believed was not reliable.

56.    As one example of the practice identified in Paragraph 55(c), the Climb Enterprise onboarded a new certificate program from long-term partner school American College of Education (ACE), using outcome data from an ACE master's program, recognizing that, because the certificate program was small, a full diligence effort might not be cost effective. Despite lacking program-specific data to calculate return-on-investment for the new program, the Climb Enterprise simply assumed, without basis, that outcome data from the master's program applied to the new certificate program to generate a passing return-on-investment calculation. Contrary to its express representations to consumers considering Climb Loans, the Climb Enterprise did not vet the new program for outcomes and value.

57.    As one example of the practice identified in Paragraph 55(d), in conducting an ROI analysis for Springboard's educational programs when it initially onboarded the school in 2017, the Climb Enterprise "[a]ssumed both graduation and placement rate, as [the] program is new and does not have" graduation or placement rates. These assumptions were not based on any reliable data. The Climb Enterprise used assumptions to get around the fact that a brand-new program by definition could not provide outcomes data necessary to conduct the kind of data-driven return-on-investment analysis it told consumers it had conducted.

58.    In more than 700 instances, the Climb Enterprise indicated that an educational program passed the return-on-investment analysis even though the Climb Enterprise had "low" confidence in the placement rate provided by that partner school.

59.    The Climb Enterprise's default rate was regularly more than 20% of its portfolio, and numerous school-specific default rates exceeded 40%.

**Defendants Made False Representations About the Outcomes for Borrowers at Partner Schools**

60.     The Climb Enterprise disseminated advertisements about Climb Loans that contained three types of representations about the specific outcomes achieved by graduates of educational programs at its Partner Schools: 1) Median Salary Increase Outcome Representations, 2) Full-Time Employment Outcomes Representations, and 3) Average Graduate Salary Outcomes Representations.

61.     Since at least 2016, the Climb Enterprise emailed or texted a survey to past Climb Loan borrowers it estimated to have graduated from a Partner School at least six months prior (the Customer Survey).

62.     Although it was used to identify outcomes for all individuals who attended the Climb Enterprise's Partner Schools, the Customer Survey population was smaller than the overall Partner School population. The Customer Survey was only sent to individuals who both attended a Partner School and financed their attendance with a Climb Loan.

63.     The Customer Survey had many deficiencies and limitations, including the following:

> a.  The Climb Enterprise affirmatively excluded from the survey those consumers who had unsubscribed from its survey email, asked the Climb Enterprise's servicer not to contact them for marketing purposes, were under 18 years of age, or were non-citizens of the United States.

> b.  The survey had a low aggregate response rate of 16%, and Climb Enterprise personnel acknowledged that a similar low response rate created "significant gaps" in the survey data.

c.  As a result of the survey exclusions and the low response rate from students who did receive the survey, the total number of survey responses that the Climb Enterprise has received represented only approximately 11% of its total originations. As recently as July 2021, the Climb Enterprise itself recognized that more than 70% of its Partner School programs lacked enough survey response data from which it could verify student outcomes.

d.  The survey data over- or under-represented respondents who attended particular Partner Schools compared to the total number of consumers who took out a Climb Loan to attend those particular Partner Schools.

e.  The survey data over- or under-represented respondents who attended schools within certain verticals (the Climb Enterprise's internal categorization of the markets in which its Partner Schools operated, e.g., coding bootcamps) compared to the total number of consumers who took out a Climb Loan to attend Partner Schools in those verticals.

64.  <u>Median Salary Increase Outcome Representation</u>: The Climb Enterprise frequently made the following representation on its website: "Median salary increase for Climb

school graduates[:] 70.3%" An example of this representation (Median Salary Increase Outcome Representation) is shown in Figure 2 below:



**Figure 2**

65.     The Climb Enterprise calculated the 70.3% figure based on responses to the Customer Survey. According to the Climb Enterprise's marketing materials, this median salary increase figure was calculated based on survey responses from borrowers who (1) graduated from a Partner School program and (2) reported both a pre-program salary and a current salary. The Climb Enterprise calculated the median pre-Climb salary of all such respondents and the median current salary and compared the results to reach the 70.3% salary increase figure.

66.     The reference to "Climb school graduates" in the Median Salary Increase Outcome Representation could convey the impression to reasonable borrowers that 70.3% was the median salary increase for *all* graduates of the Climb Enterprise's Partner Schools, including graduates who financed their attendance at those partner schools without taking out a Climb Loan.

67.     The Customer Survey data was limited to the borrowers who took out a Climb Loan, and thus did not include graduates of Partner Schools who did not take out a Climb Loan.

As a result, that survey data by definition could not provide a basis for any representation about the median salary of all graduates of the Climb Enterprise's Partner Schools.

68.    Even if the Median Salary Increase Outcome Representation conveyed the impression that it only represented the median salary increase for graduates of Partner Schools who financed their enrollment with a Climb Loan, the Climb Enterprise had no basis to make that representation for at least the following reasons:

     a.    Although the phrase "median salary increase for borrowers" conveyed the impression that the 70.3% figure was the median of all changes in salary at the individual borrower level, the Climb Enterprise actually calculated the 70.3% figure by comparing the median of all reported pre-school salaries with the median of all reported post-school salaries from the Customer Survey. However, it is not accurate to refer to a comparison between two different medians as a "median." Had the Climb Enterprise calculated the salary change for each individual borrower who responded to the survey and then determined the median of all such individual salary changes, the resulting median salary increase would have been just 45%.

     b.    The Climb Enterprise's use of the term "salary increase" implied that the 70.3% figure represented a like-for-like comparison between pre- and post-program salaries. Comparing a full-time post-program salary to the salaries for borrowers who were employed part-time prior to attending a Partner School is not a like-for-like comparison. Similarly, borrowers who were unemployed prior to attending a Partner School had no pre-attendance salary at all, so they did not have a salary that "increased." For purposes of

its calculation, the Climb Enterprise treated borrowers who had no pre-program salary as having had a $0 pre-program salary. By including borrowers who had no salary prior to attending a Partner School program or borrowers whose employment status changed from part-time to full-time after attending a Partner School program, the 70.3% figure was not a like-for-like comparison between pre- and post-program salaries. Had the Climb Enterprise calculated the median salary increase at the individual borrower level and excluded both categories of borrowers from that calculation, the resulting median salary increase would have been approximately 25%.

c. The low response rate resulted in significant gaps that skewed the data, with a potential upward bias because the nonresponsive population may have been more likely to have experienced poor outcomes compared to the responsive population.

d. The deficiencies and limitations in the Customer Survey data described in Paragraph 63 further skewed the data and made it an unreliable basis for the Median Salary Increase Outcome Representation.

69.    At times, the Climb Enterprise displayed the Median Salary Increase Outcome Representation on marketing materials for a particular Partner School, conveying a potential impression by a reasonable borrower that 70.3% was the median salary increase for all graduates from the specific Partner School being advertised.

70.    The Climb Enterprise had no basis to represent that 70.3% figure applied to graduates of the specific Partner School being advertised because, among other reasons, the

survey data on which its calculation of the 70.3% figure was based was not limited to data for graduates of that Partner School.

71.     The Climb Enterprise's Median Salary Increase Outcomes Representation was also false or otherwise misleading because the actual median salary increase for all graduates of those schools was not 70.3%. Due in part to the reasons described above, it was likely lower than 70.3%.

72.     Until at least late 2021, the Climb Enterprise's advertisements containing the representations described above included fine-print disclosures that stated: "Based on 3,506 Climb student graduate survey responses." In late 2021, the Climb Enterprise revised that statement to the following: "Based on nearly 5,000 survey responses." These disclosures were insufficient to correct the false or otherwise misleading impressions conveyed by the Median Salary Increase Outcome Representation for the following reasons:

a.   The disclosures were not in close proximity to the claim and appeared in fine print.

b.   The disclosures did not explain that the Median Salary Increase Outcome Representation was calculated based on Customer Survey responses from only borrowers who took out a loan from the Climb Enterprise, that those borrowers were not representative of all graduates of all Partner Schools, or that the figure was therefore not a median salary increase for all graduates of all Partner Schools.

c.   When the Median Salary Increase Outcome Representation appeared on school-specific marketing material, the disclosures that did not explain that the Median Salary Increase Outcome Representation was calculated based

on Customer Survey responses from Climb Loan borrowers who attended a wide variety of Partner Schools, not just responses from Climb Loan borrowers who attended the particular advertised school.

d.  The disclosures did not disclose the additional limitations and flaws in the Climb Enterprise's calculation of the Median Salary Increase Outcome Representation discussed in Paragraph 68 of this Complaint, which rendered the figure inflated and inaccurate even as a measure of the median salary increase for Climb Loan borrowers specifically.

73.    <u>Full-Time Employment Outcomes Representations</u>: The Climb Enterprise frequently made the following representations on its website and marketing materials that it provided to Partner Schools for dissemination to consumers: "Newly full-time employed Climb school graduates[:] 64%" and "66%[:] Previously-unemployed graduates who became employed full time[.]" Examples of these representations (Full-Time Employment Outcomes Representations) are shown in Figures 3 and 4 below:



**Figure 3**



**Figure 4**

74.     The Climb Enterprise calculated the 64% and 66% figures described in Paragraph 73 based on responses to the Customer Survey.

75.     By stating that the 64% and 66% figures were full-time employment statistics for "Climb school graduates" and "Previously-unemployed graduates," respectively, the Full-Time Employment Outcomes Representations conveyed the impression that those figures applied to *all* graduates of Partner Schools, including graduates who financed their attendance at those Partner Schools without taking out a Climb Loan.

76.     The Climb Enterprise had no basis to make the Full-Time Employment Outcomes Representations for at least the following reasons:

   a.  The Customer Survey data was limited to the borrowers who took out a Climb Loan, and thus did not include data from graduates of its Partner Schools who did not take out a Climb Loan. As a result, that survey data by definition could not provide a basis for any representation about full-time employment outcomes for all graduates of its Partner Schools.

   b.  The Full-Time Employment Outcomes Representations could convey to a reasonable borrower an impression that they referred to the number of graduates of a Partner School who were unemployed prior to enrolling and

whose first job after graduating from a Partner School was a full-time job. However, the Climb Enterprise had no basis to make that representation because the Customer Survey upon which the Full-Time Employment Outcomes Representations were based did not ask about the borrower's first job after graduation; only the borrower's current job.

    c.   The deficiencies and limitations in the Customer Survey data described in Paragraph 63 further skewed the data and made it an unreliable basis for the Full-Time Employment Outcomes Representations.

77.    The Full-Time Employment Outcomes Representations were also false or otherwise misleading because the actual number of graduates of a Partner School (a) who were unemployed prior to enrolling and (b) whose first job after graduating was a full-time job, as a percentage of either all students who attended a Partner School or all graduates of Partner Schools, was neither 64% nor 66% respectively. Due in part to the reasons described above, the actual numbers were likely lower than 64% and 66%, respectively.

78.    <u>Average Graduate Salary Outcomes Representations</u>: The Climb Enterprise frequently made representations about the expected average salary for graduates of certain programs (Average Graduate Salary Outcomes Representations).

79.    One of the Climb Enterprise's Average Graduate Salary Outcomes

Representations claimed that the "average grad salary" for an ACE program was "$45000-

$55000." This representation is shown in Figure 5 below:



**Figure 5**

80.    The $45,000 to $55,000 range described in Paragraph 79 was based on

information gleaned from PayScale.com, an online-reference guide for job market compensation.

Specifically, the Climb Enterprise used data from Payscale.com for the title "Teacher" and then

applied a $10,000 range around the Payscale.com median.

81.    The Climb Enterprise had no basis to make the Average Graduate Salary

Outcomes Representations for at least the following reasons:

a.    The Average Graduate Salary Outcomes Representations conveyed the

impression that the stated average salaries were program-specific.

However, the data from Payscale.com was generalized nationwide salary

data applicable to an entire profession rather than program-specific data.

For example, the representation described in Paragraph 79 conveyed the

impression that the "average grad salary" range was specific to graduates of

the ACE program, but the data from Payscale.com on which that range was

based was generalized salary data for teachers across the country,

notwithstanding the wide variation in teacher salaries based on geographic

location, education, and experience.

b. The Average Graduate Salary Outcomes Representations conveyed the

impression that the stated average salaries were specific to all graduates of

the program being advertised. However, the Climb Enterprise used salary

figures from Payscale.com that applied to certain job titles, even though

many of the advertised programs were not designed to lead to licensure or

employment for that job title. For example, most ACE programs are not

designed to lead to licensure as a teacher and many ACE programs are not

recognized by state licensing authorities, yet ACE advertised salaries for

the "Teacher" job title in connection with the ACE program.

c. The $10,000 salary range that the Climb Enterprise applied to the

Payscale.com median salary data was entirely arbitrary and lacked any

basis.

82.     The Average Graduate Salary Outcomes Representations were also false or

otherwise misleading because the actual average salary of graduates of the advertised program

was not the advertised figure. Due in part to the reasons described above, the actual average

salary of graduates of the advertised program was likely lower than the advertised figure.

83.     The Climb Enterprise's Median Salary Increase, Full-Time Employment, and

Average Graduate Salary Outcomes Representations, and other, similar representations about the

outcomes achieved by graduates of its Partner Schools (collectively, the Outcomes

Representations) made it more likely that consumers would respond to the Climb Enterprise's

marketing materials and potentially take out a loan from the Climb Enterprise to enroll in a Partner School program.

### 1/0 Was Directly Involved in Creating and Implementing Climb Credit's Marketing Strategy

84.    1/0 personnel, including its directors and employees, knew about Climb Credit's Outcomes Representations and Vetting Process Representations and Climb Credit's positioning as a trusted intermediary in the private student loan market.

85.    1/0 personnel originated the strategy of centering Climb Credit's advertising around the Outcomes and Vetting Process Representations and played a central role in the development of that marketing strategy.

86.    As early as 2017, a 1/0 employee who was also on Climb Credit's marketing team proposed to a commingled group of 1/0 and Climb Credit personnel that Climb Credit begin advertising outcomes data when marketing loans for one Partner School, and another 1/0 employee emphasized that prospective borrowers want to know about potential outcomes. That same year, a 1/0 member reviewed and commented on the proposed framework for Climb Credit's return-on-investment analysis of Partner Schools, which would form the basis of the Vetting Process Representations.

87.    From the inception of Climb Credit through at least 2020, 1/0 personnel on Climb Credit's marketing team were responsible for managing or overseeing the design and implementation of Climb Credit's marketing policies, procedures, guidelines, and practices. These 1/0 personnel participated routinely in Climb Credit's marketing review, development, and strategy.

88.    Until at least 2020, a 1/0 employee on Climb Credit's marketing team was responsible for managing or overseeing Climb Credit's website content.

89.     Another 1/0 employee was part of Climb Credit's product and design team, and had day-to-day participation in Climb Credit's marketing review, development, and strategy until at least late 2020. 1/0 regularly received marketing updates from Climb Credit, including marketing metrics.

90.     1/0 personnel were aware of substantial information indicating that the Outcome Representations and Vetting Process Representations were false or otherwise misleading.

91.     As early as 2017, and at approximately the same time that 1/0 and Climb Credit were developing a marketing strategy focused on outcomes, 1/0 flagged that Climb Credit does not "only work[] with the good programs" and a Climb Credit employee confirmed to 1/0 that Climb Credit does not collect data "in a robust, systemic way."

92.     In 2017, a 1/0 employee told a group of Climb Credit and 1/0 employees that one large Partner School likely did not have good salary outcomes. Climb Credit employees told another group of Climb Credit and 1/0 employees that most Partner Schools "actually didn't give us great data" and "[t]he schools in our top 12 don't have the best data."

93.     In 2018, Climb Credit told 1/0 that it had onboarded one of its largest Partner Schools with no return-on-investment analysis or outcomes data.

94.     In late 2018, a Climb Credit presentation to its board of directors, which was shared with 1/0, reported that only approximately 20% of schools "currently give us high quality student outcomes data."

95.     In August 2019, 1/0 questioned the value of programs at one Partner School, noting "[w]e should make sure these schools' courses are actually delivering value to students and be doubly careful about their outcomes."

96.     1/0 performed legal reviews of Climb Credit's marketing materials until at least 2020, giving 1/0 opportunity to question the basis for the advertised claims.

97.     1/0 was privy to borrower default data, which raised red flags about the value and outcomes offered by Partner Schools.

98.     1/0 has provided substantial financial support to Climb Credit since Climb Credit's founding, including as recently as 2023. The financial support that 1/0 provided was critical to Climb Credit's continued survival.

99.     Despite having knowledge of the information described in Paragraphs 84-98, 1/0 continued to participate in and provide substantial support to Climb Credit.

100.    1/0 had authority to control Climb Credit's acts and practices described in Paragraphs 40-83.

101.    During the period relevant to the allegations of this Complaint, 1/0 had authority to control Climb Credit's marketing and advertising practices through its personnel's roles at Climb Credit as founders, directors, senior managers, CEO, and CFO.

102.    Until 2019, 1/0 Holdco and two of its members (then-Climb Credit executives Mr. Rafael and Mr. Sinha) owned more than 68% of Climb Credit.

**The Climb Enterprise Miscalculated Final Truth-in-Lending Disclosures**

103.    Until approximately November 2019, the Final Truth-in-Lending Disclosures (TILA Disclosures) that the Climb Enterprise sent to consumers taking out Climb Loans systematically miscalculated the finance charge.

104.    Specifically, until approximately November 2019, the amount of the finance charge on the TILA Disclosures did not include the origination fee.

105.    Origination fees are finance charges because they are a component of the cost of consumer credit on a loan.

106.    At least 15,000 consumers received TILA Disclosures that omitted the origination fee from the disclosed finance charge. The aggregate amount of such omitted origination fees was at least $6.6 million.

**The Climb Enterprise Failed to State the Applicable APR in Advertisements that Identified Simple Interest Rates**

107.    The Climb Enterprise promotes its credit products to potential borrowers through Climb Credit's website.

108.    Until approximately November 2020, the Climb Enterprise marketed Climb Loans by detailing "example Climb loan[s]" for specific educational programs in the "Compare Programs" tool on the Climb website, identifying terms for those example loans such as the monthly payment amount and the simple interest rate.

109.    Until approximately November 2020, the Compare Programs platform did not disclose the applicable APR for the advertised example loans. An example is shown in Figure 6 below:



**Figure 6**

**The Climb Enterprise Failed to State the Applicable APR in Online Loan Calculators**

110.    The Climb Enterprise also marketed Climb Loans through an online interactive loan calculator that permitted users to model loan options for a specific educational program by adjusting the total loan amount and the simple interest rate.

111.    Once these inputs were made by the consumer, these program-specific interactive calculators generated expected monthly payments for the consumer.

112.    Until approximately November 2020, the loan calculator did not disclose the applicable APR for the advertised example loans. An example is shown in Figure 7 below:



**Figure 7**

113.    As of September 2024, the Climb Enterprise's loan calculator for one of its Partner Schools still did not disclose the applicable APR for advertised example loans.

**The Climb Enterprise Improperly Co-Branded Private Student Loan Advertisements**

114.    In the Climb Enterprise's marketing of private student loans, it used the name, emblem, or logo of Partner Schools in a manner that implied that those Partner Schools endorsed Climb Loans.

115.    Several of the Partner Schools whose name, emblem, or logo was used in such a manner were "institutions of higher education" as that term is defined by the Higher Education Act of 1965.

116.    School-specific marketing of private student loans by the Climb Enterprise implied that Partner Schools endorsed its loans, either by completely failing to disclose that those Partner Schools did not endorse those loans or consigning such a disclosure to smaller fine print at the bottom of the advertisement.

## COUNT I

### *Abusive Acts and Practices*
### *(Against All Defendants)*

117.    The Bureau re-alleges and incorporates by reference Paragraphs 1-102 of this Complaint.

118.    Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in abusive acts or practices. 12 U.S.C. § 5536(a)(1)(B).

119.    An act or practice is abusive if it takes unreasonable advantage of the consumer's reasonable reliance on a covered person to act in the interest of the consumer. 12 U.S.C. § 5531(d)(2)(C).

120.    The Climb Enterprise caused consumers to rely on Climb Credit to act in consumers' interests as a trusted intermediary to help consumers decide whether to enroll in an educational program at a Partner School and finance that enrollment with a Climb Loan, including by purportedly identifying quality educational programs for consumers by using reliable program-specific data to calculate an return-on-investment that was specific to the program being advertised and determining that the return-on-investment for the program passed the Climb Enterprise's return-on-investment analysis.

121.    Consumers' reliance on Climb Credit to act in their interests was reasonable in part because the Climb Enterprise caused the consumers' reliance by marketing Climb Credit as a trusted intermediary.

122.     The Climb Enterprise took advantage of consumers' reasonable reliance on Climb Credit to act in consumers' interests by profiting from fees and payments made by consumers who relied on Climb Credit's purported role as a trusted intermediary in deciding to enroll in a program at a Partner School and, in turn, take out a Climb Loan to finance enrollment at that Partner School.

123.     The Climb Enterprise also took advantage of consumers' reasonable reliance by touting consumers' reasonable reliance on Climb Credit to bolster its reputation, differentiate it from competitors in presentations to potential investors and partner schools, and to enable its rapid growth.

124.     The Climb Enterprise's advantage was unreasonable because they caused the consumers' reasonable reliance, which Defendants exploited to increase loan revenue, investor interest and school partnerships and to accelerate the growth of the Climb Enterprise.

125.     1/0 knew of, was recklessly indifferent to, or consciously avoided knowing about these abusive acts and practices and directly participated in them or had the ability to control them.

126.     Accordingly, Defendants engaged in abusive acts and practices in violation of sections 1031(d)(2)(C) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(C), 5536(a)(1)(B).

## COUNT II

### *Deceptive Acts and Practices*
### *(Vetting Process Representations)*
### *(Against All Defendants)*

127.     The Bureau re-alleges and incorporates Paragraphs 1-102 of this Complaint.

128.     Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in deceptive acts or practices. 12 U.S.C. § 5536(a)(1)(B).

129.    An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. Information is material to consumers if it is likely to affect a consumer's choice of or conduct regarding the product or service.

130.    In numerous instances, in their marketing of private student loans for attendance at Partner School programs, Defendants disseminated Vetting Process Representations that made express and implied representations to consumers that they had vetted Partner Schools' programs for outcomes and value and identified quality educational programs for consumers by using reliable program-specific data to calculate a return-on-investment that was specific to the program being advertised and determined that the return-on-investment for the program passed the Climb Enterprise's return-on-investment analysis.

131.    In numerous instances, the Vetting Process Representations were false or otherwise misleading because Defendants had not vetted the Partner School's program for outcomes and value or identified a quality educational program by using reliable program-specific data to calculate a return-on-investment that was specific to the program being advertised or determined that the return-on-investment for the program passed the Climb Enterprise's return-on-investment analysis. Accordingly, the Vetting Process Recommendations were likely to mislead consumers acting reasonably under the circumstances.

132.    The Vetting Process Representations were material.

133.    1/0 knew of, was recklessly indifferent to, or consciously avoided knowing about these deceptive acts and practices and directly participated in them or had the ability to control them.

134.    Accordingly, Defendants engaged in deceptive acts and practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

### COUNT III

***Deceptive Acts and Practices***
***(Outcomes Representations)***
***(Against All Defendants)***

135.    The Bureau re-alleges and incorporates by reference Paragraphs 1-102 of this Complaint.

136.    Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in deceptive acts or practices. 12 U.S.C. § 5536(a)(1)(B).

137.    An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. Information is material to consumers if it is likely to affect a consumer's choice of or conduct regarding the product or service.

138.    In numerous instances, in their marketing of private student loans for attendance at Partner School programs, Defendants disseminated Outcomes Representations that made express and implied representations to consumers about the specific outcomes achieved by graduates of educational programs at their Partner Schools, including median salary increases, full-time employment rates, and average salaries achieved by such graduates.

139.    The Outcomes Representations were likely to mislead consumers acting reasonably under the circumstances because Defendants lacked any basis for them, and the Outcome Representations were therefore unsubstantiated.

140.    The Outcome Representations were also likely to mislead consumers acting reasonably under the circumstances because they were false. The specific figures that Defendants represented as outcomes for graduates of educational programs at their Partner Schools were

inaccurate and the actual outcomes were likely lower than the figures that Defendants represented.

141.    The Outcomes Representations were material to consumers.

142.    1/0 knew of, was recklessly indifferent to, or consciously avoided knowing about these deceptive acts and practices and directly participated in them or had the ability to control them.

143.    Accordingly, Defendants engaged in deceptive acts and practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## COUNT IV

### *Substantial Assistance*
### *(Against 1/0 Holdco and 1/0 Capital)*

144.    The Bureau re-alleges and incorporates by reference Paragraphs 1-102 and 117-143 of this Complaint.

145.    It is unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of 12 U.S.C. §§ 5531, 5536(a)(3).

146.    Through their control of other Defendants and the substantial support provided to them, including through common enterprise activities with them, 1/0 Holdco and 1/0 Capital associated themselves with the other Defendants' venture, participated in the other Defendants' deceptive and abusive marketing activities, and by their actions sought to make that venture succeed.

147.    Both 1/0 Holdco and 1/0 Capital knew about, or were reckless with respect to, the conduct underlying Counts I, II, and III of this Complaint.

148.    Therefore, 1/0 Holdco and 1/0 Capital violated 12 U.S.C. § 5536(a)(3) by knowingly or recklessly provided substantial assistance to Climb Credit, Investco, and CGS in connection with Climb Credit, Investco, and CGS's violations of sections 1031 and 1036(a)(1)(B) of the CFPA described in Counts I, II, and II of this Complaint. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**COUNT V**

***TILA and Regulation Z***
***(Inaccurate Finance Charge Disclosures)***
***(Against All Defendants)***

149.    The Bureau re-alleges and incorporates by reference Paragraphs 1-39 and 103-106 of this Complaint.

150.    A creditor must accurately disclose the finance charge to the consumer before consummation of a closed-end credit transaction. 15 U.S.C. § 1638(a)(3); 12 C.F.R. §§ 1026.17(a)(1) & 1026.18(d).

151.    Climb Loans are "closed-end credit" offered and provided to "consumers," as those terms are defined in Regulation Z. 12 C.F.R. § 1026.2(a)(10) & (11).

152.    Defendants are a creditor within the meaning of Regulation Z because, from at least 2015 to the present, they regularly extended consumer credit by originating more than 25 closed-end loans in each calendar year, subject to a finance charge, and payable to Investco. 12 C.F.R. § 1026.2(a)(17)(i).

153.    Origination fees are finance charges because they are a component of the cost of consumer credit for borrowers.

154.    Until at least November 2019, Defendants omitted the origination fee from their calculation of the finance charge disclosed to at least 15,000 consumers, totaling at least $6.6 million in undisclosed origination fees.

155.    Accordingly, Defendants violated section 1638(a)(3) of TILA and sections 1026.17(a)(1) and 1026.18(d) of Regulation Z. 15 U.S.C. § 1638(a)(3); 12 C.F.R. §§ 1026.17(a)(1) and 1026.18(d).

## COUNT VI

### *TILA and Regulation Z*
### *(Advertisements Stating Interest Rate without APR)*
### *(Against All Defendants)*

156.    The Bureau re-alleges and incorporates by reference Paragraphs 1-39 and 107-109 of this Complaint.

157.    If an advertisement for closed-end credit states a rate of finance charge, it must state the rate as an "annual percentage rate," using that term. 15 U.S.C. § 1664(c); 12 C.F.R. § 1026.24(c).

158.    Until around November 2020, Defendants advertised Climb Loans through a Compare Programs tool that allowed consumers to review and compare loan terms for different educational programs.

159.    The Compare Programs platform displayed the simple interest rate for example loans without displaying the applicable annual percentage rate.

160.    Accordingly, Defendants violated section 1664(c) of TILA and section 1026.24(c) of Regulation Z. 15 U.S.C. § 1664(c); 12 C.F.R. § 1026.24(c).

## COUNT VII

### *TILA and Regulation Z*
### *(Advertisements Stating Triggering Terms without APR)*
### *(Against all Defendants)*

161.    The Bureau re-alleges and incorporates by reference Paragraphs 1-39 and 110-113 of this Complaint.

162.    If an advertisement for closed-end credit sets forth any of the triggering terms specified by Regulation Z, including the amount of any payment, then it must state, among other things, the applicable "annual percentage rate," using that term. 15 U.S.C. § 1664(d); 12 C.F.R. § 1026.24(d).

163.    Until at least March 2024, Defendants advertised Climb Loans through an online interactive loan calculator that permitted consumers to generate example monthly payments after inputting the length of a desired loan and the desired interest rate, without displaying the applicable "annual percentage rate," using that term.

164.    Accordingly, Defendants violated section 1664(d) of TILA and section 1026.24(d) of Regulation Z. 15 U.S.C. § 1664(d); 12 C.F.R. § 1026.24(d).

## COUNT VIII

### *TILA and Regulation Z*
### *(Co-branded Private Educational Loan Advertisements)*
### *(Against All Defendants)*

165.    The Bureau re-alleges and incorporates by reference Paragraphs 1-39 and 114-116 of this Complaint.

166.    Certain of Defendants' Partner Schools were covered educational institutions under TILA and Regulation Z. 15 U.S.C. § 1650(c); 12 C.F.R. § 1026.46(b)(1) and (2).

167.    A creditor, other than a covered educational institution itself, shall not use the name, emblem, mascot, or logo, of a covered educational institution, or other words, pictures, or

symbols identified with a covered educational institution, in the marketing of private education loans in a way that implies that the covered education institution endorses the creditor's loans, without a clear and conspicuous disclosure that is equally prominent and closely proximate to the reference to the covered educational institution that the covered educational institution does not endorse the creditor's loans and that the creditor is not affiliated with the covered educational institution. 12 C.F.R. § 1026.48(a).

168.    In marketing of loans for certain covered educational institutions, Defendants used the name, emblem, or logo of those schools in a manner that implied that those schools endorsed Climb Loans, without disclosures in a manner that was equally prominent and closely proximate to the reference to the covered educational institutions. At times, the marketing did not include any such disclosure; at all other times, the disclosure was consigned to fine print, which is neither equally prominent nor closely proximate to the advertisement's reference to the covered educational institutions.

169.    Accordingly, Defendants violated section 1650(c) of TILA and section 1026.48(a) of Regulation Z. 15 U.S.C. § 1650(c); 12 C.F.R. § 1026.48(a).

## COUNT IX

### *Violations of the CFPA Arising From Regulation Z Violations*
### *(Against All Defendants)*

170.    The Bureau re-alleges and incorporates by reference Paragraphs 1-39, 103-116, and 149-169 of this Complaint.

171.    Under the CFPA, it is unlawful for covered persons to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law or, otherwise commit any act or omission in violation of a Federal consumer financial law. 12 U.S.C. § 5536(a)(1)(A).

172.    TILA and Regulation Z are Federal consumer financial laws. 12 U.S.C.

§ 5481(14).

173.    Accordingly, Defendants' violations of TILA and Regulation Z, described in

Counts V through VIII, constitute violations of section 1036(a)(1)(A) of the CFPA. 12 U.S.C. §

5536(a)(1)(A).

## DEMAND FOR RELIEF

As permitted by 12 U.S.C. § 5565, the Bureau requests that the Court:

    a.  permanently enjoin Defendants from committing future violations of the
CFPA, TILA, and Regulation Z;

    b.  grant additional injunctive relief as the Court deems to be just and proper;

    c.  award monetary relief against Defendants, including but not limited to, the
refund of monies paid, restitution, disgorgement or compensation for unjust
enrichment, and payment of damages;

    d.  impose civil money penalties against Defendants under 12 U.S.C.
§ 5565(c);

    e.  order Defendants to pay the Bureau's costs incurred in connection with
prosecuting this action; and

    f.  award additional relief as this Court deems just and proper.

Dated: October 17, 2024          Respectfully submitted,

Eric Halperin
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Adam E. Lyons
*Assistant Deputy Enforcement Director*

/s/ Christopher Sousa_____
Christopher Sousa (DC Bar No. 1018547)
Anjali Garg (DC Bar No. 1024620)
Mechelle King (DC Bar No. 1754280)
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
(202) 435-9809 (Sousa)
(202) 435-9217 (Garg)
(202) 435-9943 (King)
christopher.sousa@cfpb.gov
anjali.garg@cfpb.gov
mechelle.king@cfpb.gov

*Attorneys for Plaintiff*
*Consumer Financial Protection Bureau*